**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| Data Integrators, Inc.<br>1190 International Parkway, Suite 109<br>Fredricksburg, VA 22406<br><br>and<br><br>Robert Denton<br>1190 International Parkway, Suite 109<br>Fredricksburg, VA 22406<br><br>and<br><br>Andrew Jessop<br>1190 International Parkway, Suite 109<br>Fredricksburg, VA 22406<br><br>          Plaintiffs,<br><br>v.<br><br>U.S. Government Publishing Office<br>732 N. Capitol Street NW<br>Washington, DC 20410-0001<br><br>and<br><br>Davita Vance-Cooks<br>Director<br>U.S. Government Publishing Office<br>732 North Capitol Street, NW<br>Washington, DC 20401-0001<br><br>and<br><br>Jim Bradley<br>Suspending and Debarring Official<br>U.S. Government Publishing Office<br>732 North Capitol Street, NW<br>Washington, DC 20401-0001<br><br>          Defendants. | Civil Action No.: _____ |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF FROM DEBARMENT ORDER

Plaintiffs Data Integrators, Inc., Robert Denton and Andrew Jessop (collectively, "DI" or "Plaintiffs"), by and through their undersigned counsel, bring this action against the United States Government Publishing Office ("GPO"), Davita Vance-Cooks, Director of the GPO, and Jim Bradley, Suspending and Debarring Official for the GPO, for a permanent injunction and a declaratory judgment related to the GPO's improper debarment of DI. In support thereof, Plaintiffs respectfully state:

## PARTIES

1. Data Integrators, Inc. is a Virginia Corporation with its principal place of business located at 1190 International Parkway, Suite 109, Fredricksburg, Virginia 22406. Data Integrators, Inc. is a minority and veteran-owned small business.

2. Robert Denton is the President of Data Integrators, Inc.

3. Andrew Jessop is the Vice President of Sales at Data Integrators, Inc.

4. The United Stated Government Publishing Office is a United States Federal Government Agency with its principal place of business in Washington, DC.

5. Davita Vance-Cooks is the Director of the GPO. Her principal place of business is in Washington, DC. Ms. Vance-Cooks is sued in her official capacity.

6. Jim Bradley is a Suspending and Debarring Official for the GPO. His principal place of business is Washington, DC. Mr. Bradley is sued in his official capacity.

## JURISDICTION

7. This Court has jurisdiction over this matter as an agency's decision to debar a government contractor is subject to review under the standards prescribed in the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.*

## BACKGROUND FACTS

Solicitation and Bid

8. On August 16, 2016, the GPO issued Solicitation 5517-S ("Solicitation") a project referred to as "W-2, Affordable Care Act ("ACA"), 1099 and Retired Pay Statements" ("the Project"). A copy of the Solicitation is attached hereto as Exhibit 1.

9. The Solicitation included the following information:

> Backup Facility - The failure to deliver the products required under this specification in a timely manner would have an impact on the daily operations of USCG. Therefore, it for any reason(s) (act of God, labor disagreements, etc.) the contractor is unable to perform at said locations for a period longer than five (5) workdays, contractor must have a backup facility with the capability of producing the products required under this specification.
>
> Plans for their contingency production must be prepared and submitted to the Contracting Officer as part of the preaward survey. These plans must include the location of the facility to be used, equipment available at the facility, and a timetable for the start of production at the facility. Part of the plan must also include the transportation of Government material from one facility to another.
>
> NOTE: All terms and conditions of this contract will apply to the backup facility.

10. DI reasonably interpreted this language as requiring bidders to have a backup facility, which, **in the event that the bidder was unable to perform at its primary location for a period longer than five (5) workdays ("Disaster Event")**, could be used to perform the requirements of the Project.

11. DI reasonably believed that it would have at least thirty (30) days between notification of award and the start of performance because, based on its substantial experience performing GPO contracts, DI was aware that actual performance and production would not begin until after the post-award conference, when the Government would provide DI with a

3

purchase order and the supplied materials. As explained below, this belief was later corroborated by Sarah Jackson, a Senior Printing Official from the GPO's Washington D.C. office. She advised DI that the effective date for production to begin was after January 1, 2017.

12. In reliance on its reasonable interpretation of the Solicitation, DI prepared its bid and submitted the bid on September 7, 2016. A copy of DI's bid is attached hereto as Exhibit 2.

13. Pursuant to the terms of the Solicitation, the bid expired 60 days from submittal, or on November 7, 2016.

14. On or about September 20, 2016, DI was informed that it was the low bidder. At that time, DI was asked to confirm its bid price and begin work on its Preaward Survey.

15. On or about September 22, 2016, DI submitted its Preaward Survey to the GPO. A copy of the Preaward Survey is attached hereto as Exhibit 3.

16. In its Preaward Survey, DI discussed its backup facility and stated the following:

> All conditions and commitments apply to both the primary and backup facility.
>
> The backup facility is located at 110 Gelo Road in Rocky Mount, North Carolina, 27804. In the event of a loss of operations in the Fredericksburg facility that is anticipated to extend beyond 5 days, the physical processing will be reinstated in this facility within five (5) calendar days.

17. Consistent with the requirements of the Solicitation, DI's Preaward Survey discussed the logistics of moving the data processing operations to the 110 Gelo Road site (the "Backup Facility"), and how materials would be stored in the event the Backup Facility was utilized.

18. DI's submissions explained that it was prepared to, and, indeed, planned to, have the Backup Facility prepared to perform the requirements of the contract within five (5) days of a Disaster Event at is primary production site.

19. In fact, DI planned to have the Backup Facility prepared to perform no later than thirty (30) days after notification of award, which, would, at the very earliest, coincide with the first day of performance of the contract.  Thus, should a Disaster Event occur even on the very first day, the Gelo Road Backup Facility would be able to take over performance of the requirements of the Project.

<u>Preaward Survey and Contact with GAO Concerning Backup Facility</u>

20. After submitting its Preaward Survey, DI was contacted by Sarah Jackson, a Senior Printing Official from the GPO's Washington D.C. office. Ms. Jackson reached out to Mr. Denton, requesting a site visit to DI's main printing facility in Fredericksburg, Virginia.

21. DI complied and a site visit was scheduled for October 5, 2016.

22. During the site visit Mr. Denton and Ms. Jackson discussed several things, including a number of issues relating to the Backup Facility.  For clarity's sake, DI offers the following history concerning it's company and its Backup Facility in particular.

<u>DI and its Primary and Backup Facilities</u>

23. DI's primary location is at 1190 International Parkway, Suite 109, Fredericksburg, VA 22406 ("Primary Facility").  DI has operated the Primary Facility for 8 years.

24. On or about April 14, 2008, DI began renting a second space in Rocky Mount, North Carolina.  More specifically, DI began renting an approximately 20,000 square foot space in a facility located on Gelo Road.

25. At the time DI entered into this rental arrangement, DI incorrectly believed that the address of its Gelo Road space was 105 Gelo Road, Rocky Mount, North Carolina.  This was because the owner of the facility incorrectly advised DI that its address was 105 Gelo Road.

5

26. Though DI and the owner of the Backup Facility property entered into a binding and enforceable oral lease contract, there was no written contract executed. Thus, there was no document that provided the specific address of the space leased. That said, all parties understood that the lease pertained to a specific, segregated space of approximately 20,000 square feet within the Gelo Road building, and that the address associated with that space was 105 Gelo Road.

27. On November 5, 2013, there was a break-in at the Backup Facility. During the break-in, some equipment was stolen, and other equipment was damaged. Even so, the remaining, undamaged equipment was sufficient to perform most GPO contracts. With respect to the stolen and/or damaged equipment and other damages incurred, DI filed an insurance claim regarding the break-in. The insurance claim for this break-in was paid in full in August 2016.

28. During the investigation related to the insurance claim, the insurance investigator informed DI and its landlord that they were mistaken with regard to the address of the Backup Facility. The insurance adjuster explained that because the Gelo Road building had been expanded twice, there were at least three (3) separate numerical street addresses associated with the building. The insurance investigator informed DI that the specific numerical street address associated with DI's rented space was 110 Gelo Road. DI's landlord subsequently confirmed that the correct address was 110 Gelo Road.

29. On August 15, 2015, there was a second break-in at the Backup Facility. No equipment was stolen, but there was some damage to electrical panels. At the time the bid was submitted, DI was working with the owner of the Backup Facility to remedy the electrical issues caused as a result of this damage.

6

Further Conversations with the Government

30. On or about October 5, Ms. Jackson visited DI's Primary Facility. She was onsite for approximately 2 hours and, during that time, she toured the facility and had a 20-30 minute conversation with Mr. Denton concerning DI's bid and Preaward Survey. As part of this conversation, Ms. Jackson raised some questions about the Backup Facility.

31. With regard to DI's ability to use the Backup Facility in the case of a Disaster Event, Mr. Denton explained DI's interpretation of the Solicitation, as discussed above, and further explained how DI planned to prepare the Backup Facility for performance within 30 days of notification of award. As part of this conversation, Mr. Denton advised Ms. Jackson that it was DI's understanding that it would have at least 30 days between the notification of award and the start of performance. Ms. Jackson agreed that this was a reasonable belief and an appropriate timeframe.

32. During the October visit, Ms. Jackson also asked what effect, if any, the two break-ins at the Backup Facility might have on DI's performance. Mr. Denton advised Ms. Jackson that the loss of equipment from the first break-in would not have any effect, as DI's Backup Facility still had sufficient equipment to perform the requirements of the contract. With regard to the electrical issues caused by the second break-in, Mr. Denton advised Ms. Jackson that DI was in the process of working with the landlord of the Backup Facility to get the electrical problems remedied. Moreover, in an abundance of caution, in case the landlord for any reason was not able to get the electrical problems resolved in sufficient time, DI had already located an alternative Backup Facility. In short, neither the loss of equipment from the first break-in, nor the electrical problems caused as a result of the second break-in would prevent DI from having a Backup Facility up and ready for production thirty (30) days after notification of

award. Ms. Jackson was also given a copy of the insurance claim and financial resolution at this time, along with a copy of the inventory.

33. At the conclusion of the meeting, Ms. Jackson appeared to understand that, no matter what, DI could, and intended to, have the Backup Facility ready and capable of performing within 30 days of notification of award. In other words, Ms. Jackson appeared to understand that no later than the first day of performance, the Backup Facility would be ready; therefore, even if a Disaster Event occurred on the very first day of performance, the Backup Facility would be able to take over performance of the requirements of the Project. There would be no delay to Project performance at all.

34. Following the meeting with Ms. Jackson, DI received an email from Mr. Charles Szopo of the GPO requesting to arrange a tour of its Backup Facility for GPO representatives.

35. Shortly thereafter, Mr. Denton responded and advised Mr. Szopo that DI could provide a tour on October 12, 2016. In that same email, Mr. Denton discussed the break-ins at the Backup Facility, and clarified that the damage would be repaired no later than December 1, 2016. Moreover, Mr. Denton clarified that the remaining, undamaged equipment was sufficient to perform the contract requirements if necessary. Mr. Denton offered to show the GPO the equipment that would be used to perform the contract (if necessary) as part of the October 12 tour. Further, Mr. Denton also confirmed the address of the facility, 110 Gelo Road.

36. DI never received a response from Mr. Szopo regarding the tour of the Backup Site.

37. As stated above, pursuant to the terms of the Solicitation, the bid expired 60 days from submittal, or on November 7, 2016. On November 7, 2016, after over a month with no

communication, DI emailed Mr. Szopo and stated that it was withdrawing its bid due to other commitments and upcoming projects that DI felt offered better business opportunities.

38. After submission of this email, DI did not take any further steps to remedy the electrical problems at the Backup Facility or secure a different location, as it did not plan to perform the contract.

Government Investigators Visit DI and Interview Mr. Denton

39. Then, on or about January 27, 2017, DI was again contacted regarding the Solicitation. On that date, two (2) individuals, Keith Olive from the Inspector General's Office of the GPO and an individual from the U.S. Department of Homeland Security (collectively, "the Investigators"), visited DI's Primary Facility and requested to speak to Mr. Denton.

40. Mr. Denton met with the Investigators for approximately an hour and forty-five minutes. During the course of the conversation it became apparent that the Investigators were interested in learning more about DI's Backup Facility.

41. The Investigators' primary concern appeared to be with the address of the Backup Facility. The Investigators asked Mr. Denton why the address listed on the Preaward Survey was 110 Gelo Road, when DI was registered elsewhere with an address of 105 Gelo Road and/or 108 or 111 Gelo Road.

42. Upon reflection, Mr. Denton realized that the incorrect address must have been entered into an electronic database previously, and never updated. In order to bid on GPO procurements, DI was required to input certain information into the GPO's "Contractor Connection" website. One of the required pieces of information was the location of DI's production facility and any backup facilities.

43. Mr. Denton explained that, as discussed above, prior to the November 2013 break-in, DI incorrectly believed that the address of its Backup Facility was 105 Gelo Road, Rocky Mount, NC. However, DI subsequently learned that the correct address was, in fact, 110 Gelo Road. From that point forward, DI used 110 as the address of its Backup Facility. Accordingly, 110 Gelo Road was the address used on its Preaward Survey. Unfortunately, due to an administrative oversight, the Backup Facility address was never updated on the Contractor Connection website.

44. The Investigators also asked about the break-ins at the Backup Facility. Mr. Denton reiterated the information he provided to Ms. Jackson regarding the Backup Facility. Specifically, he advised the Investigators that the Backup Facility had been broken into twice but that, notwithstanding those break-ins, DI was prepared to have a Backup Facility ready for production no later than thirty (30) days after notification of award, which would coincide, at the earliest, with the first day of performance. Thus, the Backup Facility would certainly have been ready to take over production within five (5) days of a Disaster Event.

45. The Investigators asked Mr. Denton to clarify if the Backup Site was ready to perform at the time of bid submission. Consistent with all of the above, and with DI's reasonable interpretation of the Solicitation, Mr. Denton indicated that the Backup Facility was not operational at the time of the bid submission, but that it would have been operational by commencement of performance and, in any case, in time to perform in the case of a Disaster Event. All of this was consistent with DI's reasonably interpretation of the Solicitation.

46. The next communication received by DI on the subject of the Solicitation was the Notice of Potential Debarment, which was issued on April 25, 2017, several months after DI's meeting with the Investigators.

The Debarment Proceedings are Initiated

47. On or about April 25, 2017, DI received notice from Jim Bradley, the Suspending and Debarring Official ("SDO") for the GPO, that a debarment action had been initiated against Data Integrators, Inc., Robert Denton and Andrew Jessop (the "Proposed Debarment Letter"). A copy of the Proposed Debarment Letter is attached hereto as Exhibit 4.

48. The Proposed Debarment Letter referenced language in GPO Directive 110.11C that states that causes for debarment include any "cause of so serious or compelling a nature that it affects the present responsibility of a Government contractor or subcontractor."

49. The Proposed Debarment Letter alleged that DI's September 21, 2016 bid included certain false representations. Specifically, the Proposed Debarment Letter stated:

> The OIG's investigation found that DI provided false statements to GPO, claiming to have a "backup facility" and thus meeting the conditions of the solicitation. Specifically, DI claimed in their proposal "all conditions and commitments apply to both the primary and backup facility. The backup facility is located at 110 Gelo Road in Rocky Mount, North Carolina." (Page 5 of contractor's proposal, Pre Award Survey Plans.) This false representation to GPO led the Government to believe DI owned the required secondary facility capable of producing documents and forms in a timely manner in the event the performance of work was disrupted at the primary facility (due to, for example, acts of God or labor disagreements).
>
> However, Mr. Denton later admitted in a statement to investigators that the company's "backup facility" was not functional at the time of the bid submission, nor has it ever been in compliance with contract terms since the leasing of the building in late 2009 or early 2010. Mr. Denton further admits that his intention was to bring the facility up to contract standards only "after the contract award was made and money became available to him." Thus by the contractor's own admission, the earlier representations to GPO during the solicitation process were false and did not reflect DI's true capabilities to perform the requirements of the contract. Because of the ease in which DI was willing to misrepresent its capabilities and because of their non-compliance with the terms and conditions of the Solicitation, the Government cannot form a

11

>   reasonable expectation this contractor meets the standards of a
>   responsible offeror. It is, therefore, in the best interest of the
>   government to bar DI from doing further business with GPO.

50. The Proposed Debarment Letter inaccurately represented Mr. Denton's statements to Ms. Jackson and the Investigators.

51. The Proposed Debarment Letter did not include the referenced OIG Report.

52. The Proposed Debarment Letter stated that within thirty (30) days DI could submit information and argument in opposition to the proposed debarment, including any additional specific information that raised a genuine dispute over the material facts.

53. On or about June 8, 2017, counsel for DI formally responded to the Proposed Debarment Letter ("DI Response") and challenged the factual and legal bases for the proposed debarment.  A copy of the DI Response is attached hereto as Exhibit 5.

54. The DI Response made clear that DI did not, in fact, engage in any misrepresentation regarding its Backup Facility.  The DI Response stated that "[a]t no time did DI indicate that its Backup Facility was operational at the time of bid or Preaward Survey Submission.  DI has always maintained that the Backup Facility would be made ready for performance after notification of award."

55. The DI Response also made clear that any purported misrepresentation alleged in the Proposed Debarment Letter was not based on an intent to mislead but rather was a misunderstanding of ambiguous terms in the subject Solicitation.  DI stated that the Backup Facility would have been fully functional by the time production on the Contract began, which DI reasonably understood to be acceptable under the terms of the Solicitation.

56. DI requested that the GPO consider DI's factual assertions, mitigating circumstances and DI's proposed corrective action. DI requested that the SDO meet with DI in order to resolve the matter through an administrative agreement.

57. DI also requested a copy of the OIG Report that was referenced in the Proposed Debarment Letter.

<u>The Notice of Debarment</u>

58. By letter dated July 19, 2017 ("Notice of Debarment"), DI received notice of the SDO's decision to debar the Plaintiffs. A copy of the Notice of Debarment is attached hereto as Exhibit 6.

59. The Notice of Debarment referenced the arguments set forth in the DI Response and stated that it found those arguments to be unpersuasive. There was no specific response to DI's point regarding a total lack of "misrepresentation," nor was there any response concerning how, given such a lack of "misrepresentation," a determination that DI was not responsible could be made.

60. The Notice of Debarment also referenced new factual allegations that were not raised in the Proposed Debarment Letter, stating:

> Second, considering the condition of the facility, DI could not make that facility operational within 30 days let alone in five (5) days—as required by the contract— if needed: Data Integrators was in significant arrears in lease payments and in jeopardy of being removed from the facility; the property was placed on the market for sale in "As is" condition at time of contract performance; vandalism caused $90,000 worth of repairs in the past few years; copper wiring and fuse boxes were damaged; there was no wiring from the utility poles to the buildings thus rendering the property without power for a year and a half; and, DI filed an insurance claim, claiming $1.3 million worth of office equipment was stolen or destroyed, equipment which is needed for that facility to function as a backup. As a result, no reasonable

> person could conclude this facility would have been fully functional by the time production on the contract began notwithstanding DI's arguments to the contrary and their interpretation of the facts.

61. Like the Proposed Debarment Letter, the Notice of Debarment included numerous factual allegations that were entirely inaccurate and unfounded. For example: the owner had never raised questions regarding the timeliness of DI's lease payments; the property had been for sale for 6 years, and its status as such had no bearing on Mr. Denton's lease, which was going to be a condition of any sale; and the theft did not render the space unusable or unable to function as a backup facility. The landlord could have corroborated all of this. However, upon information and belief, neither the GPO nor the Investigators ever interviewed the landlord about these issues. Similarly, neither the GPO nor the Investigators ever interviewed the police officer(s) involved in the investigation of the two break-ins.

62. Based on the inaccurate and unfounded allegations, a number of which were raised for the first time in the Notice of Debarment, the Plaintiffs were debarred from doing business with the GPO effective August 1, 2017, and ending July 1, 2020.

63. Plaintiffs, through counsel, requested a hearing in accordance with, *inter alia*, GPO Directive 110.11C and GPO Printing Procurement Regulation ("GPO PPR"), GPO Publication 305.3, Chapter 1, Section 11, Suspension and Debarment. A copy of the email chain containing the hearing request is attached hereto as Exhibit 7.

64. GPO Directive 110.11C sets forth the GPO's administrative procedures for suspension and debarment. Those procedures are also contained in the GPO PPR, GPO Publication 305.3, Chapter 1, Section 11, Suspension and Debarment.

65. GPO PPR Chapter 1, Section 11(6)(b) provides that:

> Decision-Making Process

>These procedures governing the debarment decision-making process are as informal as is practicable, consistent with the principles of fundamental fairness. These procedures afford the contractor…an opportunity to submit, in person, in writing, or through a representative, information and argument in opposition to the proposed debarment.

66. Pursuant to GPO Directive 110.11C(10)(e)(3) and GPO PPR Chapter 1, Section 11(6)(e)(3), in any action in which the proposed debarment is not based upon a conviction or civil judgment, the cause for debarment must be established by a preponderance of the evidence.

67. GPO Directive 110.11(C)(10)(c) and GPO PPR Chapter 1, Section 11(6)(c) state:

>c. Disputed Material Facts. In actions not based upon a conviction or civil judgment, if it is found that the contractor's submission in opposition raises a genuine dispute over facts material to the proposed debarment, the GPO shall also:
>
>>(1) Afford the contractor an opportunity to appear with counsel, submit documentary evidence, present witnesses, and confront any person the agency presents; and
>
>>(2) Make a transcribed record of the proceedings and make it available at cost to the contractor upon request, unless the contractor and the agency, by mutual agreement, waive the requirement for a transcript.

68. The DI Response raised genuine disputes over facts material to the proposed debarment. The GPO arbitrarily and capriciously ignored the issues raised by DI.

69. Moreover, the Notice of Debarment raised a number of factual allegations for the first time. DI was given no opportunity to respond to, or present evidence in contradiction of, those new factual allegations. DI would have been able to present evidence that rebutted the new factual allegations raised in the Notice of Debarment through, *inter alia*, the presentation of witnesses or sworn affidavits from, among others, the landlord at the Backup Facility and the police officer(s) who investigated the break-ins at that facility.

70. The GPO failed to conduct a hearing of any kind prior to the issuance of the Notice of Debarment in violation of GPO Directive 110.11(C)(10)(c) and GPO PPR Chapter 1, Section 11(6)(c).

71. After receipt of the Notice of Debarment, and noting that it contained new factual allegations that had not previously been raised by the GPO, DI requested a hearing in accordance with, *inter alia*, GPO Directive 110.11C and GPO PPR Chapter 1, Section 11(6)(c).

72. Following Plaintiffs' request for a hearing, the GPO notified Plaintiffs that the GPO is "not inclined to give [DI] a hearing."

### COUNT I:  DECLARE DEBARMENT ORDER VOID AND UNENFORCEABLE

73. Plaintiffs hereby incorporate by reference the allegations made in paragraphs 1 through 72 above, and re-allege them as though fully set forth herein.

74. The GPO's decision to debar Plaintiffs was arbitrary, capricious, not in accordance with law or regulation, made in bad faith, imposed for purposes other than the protection of the government's interests and is therefore void and unenforceable.

75. DI asserts that the following grounds exist to declare the debarment void and unenforceable:

> a. Debarment of DI pursuant to GPO Directive 110.11C and/or GPO PPR Chapter 1, Section 11 is unsupported by the Administrative Record and not in accordance with law;
>
> b. The SDO failed to use the proper standard of proof under GPO Directive 110.11C and GPO PPR Chapter 1, Section 11 in debarring Plaintiffs;
>
> c. The Administrative Record fails to support the following findings made by the SDO and documented in the Notice of Debarment:

    i. DI "misrepresented their capabilities (regarding the backup facility)" in DI's bid.

    ii. "DI could not make that facility operational within 30 days let alone in five (5) days – as required by the contract – if needed."

    iii. "[N]o reasonable person could conclude this facility would have been fully functional by the time production on the contract began."

    iv. "[T]here is adequate evidence to establish a lack of business integrity or business honesty and/or a failure to comply with GPO Contract Terms, which directly affects the responsibility of DI in the present case."

    v. "DI's inability to provide a functioning back-up facility supports a determination of DI's non-responsibility."

    vi. "DI does in fact poses a business risk to the Government."

d. The SDO violated the procedures set forth in GPO Directive 110.11C and GPO PPR Chapter 1, Section 11 by issuing the Notice of Debarment without affording Plaintiffs a hearing and the right to submit documentary evidence, present witnesses, and confront any person the agency presents, despite the fact that the DI Response raised genuine disputes over facts material to the proposed debarment;

e. The SDO's debarment violates DI's due process rights and liberty interests afforded by the Constitution; and

f. The SDO's debarment violates DI's due process rights by penalizing DI without affording them a hearing and the right to confront witnesses.

## COUNT II: REQUEST FOR PERMANENT INJUNCTIVE RELIEF

76. Plaintiffs hereby incorporate by reference the allegations made in paragraphs 1 through 75 above, and re-allege them as though fully set forth herein.

77. DI will succeed on the merits. Contrary to the allegations contained in the Notice of Debarment, DI had a second facility that would have been available for use in accordance with the requirements of the Solicitation. To the extent that DI's proposal did not satisfy the requirements of the Solicitation, that discrepancy was based on ambiguous terms in the Solicitation, rather than an intent to mislead. Moreover, in issuing the Notice of Debarment, the GPO failed to adhere to its own administrative debarment procedures, which require a hearing in cases where a contractor's submission in opposition to a proposed debarment raises a genuine dispute over material facts.

78. If an injunction is not issued, Plaintiffs will suffer irreparable harm, as their ability to function as an ongoing business on state and federal public contracts will be thwarted. Additionally, Plaintiffs will be unable to bid on future federal and state construction projects until July 1, 2020.

79. Any parties with whom Plaintiffs currently have contracts will not be harmed if the injunction is issued. No governmental agency outside of the GPO has raised allegations regarding Plaintiffs' performance or integrity.

80. The public interest will be furthered by the injunction in that the public has a right not to be subjected to unlawful and improper debarment proceedings and to demand that its public officials discharge their duties in accordance with law and regulation.

81. The GPO's debarment was arbitrary and capricious, not in accordance with law and regulation, made in bad faith, and imposed for purposes other than the protection of the government's interests.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that the Court:

1. Issue a declaratory judgment that the GPO's Notice of Debarment against the Plaintiffs is void and unenforceable;

2. Issue a permanent injunction with respect to the effectiveness and enforcement of the GPO's July 1, 2017 Notice of Debarment;

3. Terminate the GPO's debarment *ab initio*;

4. Award Plaintiffs their reasonable attorneys' fees and costs expended herein; and

5. Grant such other and further relief as this Honorable Court deems just.

Dated: January 19, 2018                    Respectfully submitted,

/s/ Maria L. Panichelli
MARIA L. PANICHELLI
Cohen Seglias Pallas Greenhall & Furman, PC
United Plaza, 19th Floor
30 South 17th Street
Philadelphia, PA 19103
T: 215.564.1700
F: 215.564.3066
mpanichelli@cohenseglias.com

*Counsel for Plaintiffs*
*Data Integrators, Inc., Robert Denton*
*and Andrew Jessop*